UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

DORA J. VAJNER,                    )
                                   )
              Plaintiff            )
                                   )
         v.                        )    Case No. 2:09-cv-245
                                   )
CITY OF LAKE STATION, INDIANA,     )
                                   )
              Defendant            )

OPINION AND ORDER

This matter is before the court on the Motion for Summary
Judgment [DE 21] filed by the defendant, City of Lake Station,
Indiana, on August 31, 2010.  For the reasons set forth below,
the motion is DENIED.

Background

The plaintiff, Dora Jean Vajner, was employed in the Clerk-
Treasurer's Office of the City of Lake Station, Indiana, from
1984 until she was discharged on January 2, 2008.  The Clerk-
Treasurer's Office consisted of one small office for the Clerk-
Treasurer, another small office occupied by Vajner and a co-
worker, and a larger office housing several additional desks.
The total space of the office was such that telephonic communica-
tion between office staff was unnecessary - a sufficiently loud
enquiry could be heard by everyone.

As of 2007, the Clerk-Treasurer's budget included the positions of Clerk-Treasurers 1—4, indicating four clerks in the office subordinate to the Clerk-Treasurer.  Vajner initially was hired to fill the position of Deputy #3, but she was promoted to the Deputy #1 position when the former Deputy #1 retired.  Deputy #1 was the second highest ranking position in the Clerk-Treasurer's Office and received the second highest salary.  Lake Station did not have formal written job descriptions for the deputy clerk positions in the Clerk-Treasurer's Office. The clerks learned their responsibilities by example without any formal training.  However, the authority to carry out some duties, such as signing city checks, was limited to the Clerk-Treasurer and Deputy #1, who also was a signatory on Lake Station's bank account.

As Deputy #1, Vajner often assumed the responsibilities of the Clerk-Treasurer whenever that position became vacant.  Vajner served as Deputy #1 under Rebecca Williams for six to seven years.  When Williams left the position of Clerk-Treasurer, Vajner assumed her responsibilities until Mary Knox took office.  Thereafter, when Knox left the position of Clerk-Treasurer, Vajner again was required to fill the position for approximately two weeks until another individual was elected, Donna Smelley. Vajner served as Deputy #1 under Smelley for the next 16 or 17 years.

Smelley did not come into the office on a daily basis and generally limited her work to council and board meetings. The work in the office during this time "was left up to the girls." (Dep. of Dora Vajner at p. 114) Near the end of Smelley's term, Smelley became ill, stopped coming into the office entirely by September 2006, and passed away in January 2007. As before, Vajner assumed the responsibilities of Clerk-Treasurer during this vacancy.

Shortly thereafter, Lake Station Council passed two ordinances increasing Vajner's pay for assuming the duties generally reserved to the Clerk-Treasurer. Vajner continued acting as the interim Clerk-Treasurer and received the pay increases until January 2007, when Martha Kroledge assumed the Clerk-Treasurer position. As a result of the vacancy between Smelley and Kroledge's tenures, however, Vajner was privy to budget meetings that took place in 2006 and 2007 for budget years 2007 and 2008, respectively.

Later in 2007, the position of Clerk-Treasurer was up for election. As was customary, Vajner supported the incumbent and her superior at the time, Kroledge, against Brenda Samuels in the primary election. Vajner personally assisted Kroledge's re-election efforts by distributing political flyers house to house in the community. During the same primary election, the Mayor of

Lake Station, Keith Soderquist, approached Vajner at home and asked for her vote in the upcoming election. Vajner declined his invitation.

Soderquist was re-elected as mayor, and Samuels was elected Clerk-Treasurer. Both took office January 1, 2008. One day later, Samuels terminated Vajner. After January 2, 2008, the Mayor's step-daughter, Miranda Brakely, a person younger than Vajner, was hired to replace Vajner and assume the position of Deputy #1 in the office of the Clerk-Treasurer.

Consequently, Vajner filed suit against Lake Station alleging both constitutional and statutory violations. Vajner maintains that she was the victim of an illicit patronage dismissal in violation of her First and Fourteenth Amendment rights under the United States Constitution, age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), and a conspiracy to deprive her of her civil rights in violation of 42 U.S.C. §1985(3). Lake Station seeks summary judgment on each claim.

## Discussion

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is proper only if it is demonstrated that "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Celotex Corp. v.

Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Stephens v. Erickson, 569 F.3d 779, 786 (7th Cir. 2009). The burden is upon the moving party to establish that no material facts are in genuine dispute, and any doubt as to the existence of a genuine issue must be resolved against the moving party. Adickes v. S.H. Kress & Company, 398 U.S. 144, 160, 90 S.Ct. 1598, 1610, 26 L.Ed.2d 142, 155 (1970); Stephens, 569 F.3d at 786. A fact is material if it is outcome determinative under applicable law. There must be evidence on which the jury could reasonably find for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 212 (1986); Stephens, 569 F.3d at 786; Wheeler v. Lawson, 539 F.3d 629, 634 (7th Cir. 2008).

Summary judgment is inappropriate for determination of claims in which issues of intent, good faith, and other subjec-tive feelings play dominant roles. Ashman v. Barrows, 438 F.3d 781, 784 (7th Cir. 2006). Upon review, the court does not evalu-ate the weight of the evidence, judge the credibility of wit-nesses, or determine the ultimate truth of the matter; rather, the court will determine whether there exists a genuine issue of triable fact. Wheeler, 539 F.3d at 634 (citing Anderson, 477 U.S. at 248, 106 S.Ct. at 2510).

In deciding a motion for summary judgment, the trial court must determine whether the evidence presented by the party opposed to the summary judgment is such that a reasonable jury might find in favor of that party after a trial.

> The inquiry performed is the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.
>
> [T]his standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict.
>
> Anderson, 477 U.S. at 250, 106 S.Ct. at 2511

See also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149-151, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105, 120-122 (2000) (setting out the standard for a directed verdict); Celotex Corp., 477 U.S. at 322-23, 106 S.Ct. at 2553; Stephens, 569 F.3d at 786; Argyropoulos v. City of Alton, 539 F.3d 724, 732 (7th Cir. 2008) (stating that a genuine issue is one on which a reasonable fact finder could find for the nonmoving party); Springer v. Durflinger, 518 F.3d 479, 483 (7th Cir. 2008)(stating that a genuine issue exists and summary judgment is inappropriate if there is sufficient evidence for a jury to return a verdict for the nonmoving party).

6

Vajner asserts that Lake Station, through an improper patronage dismissal, violated her right to free speech secured by the First and Fourteenth Amendments of the United States Constitution and her rights under the ADEA. Lake Station contends, however, that Vajner's position was "confidential" or "policy making" so that the ADEA did not extend coverage to her position and termination based on political affiliation was permissible.

The First Amendment prohibits conditioning public employment upon political affiliation. Rutan v. Republican Party of Illinois, 497 U.S. 62, 74, 110 S.Ct. 2729, 2736, 111 L.Ed.2d 52 (1990); Branti v. Finkel, 445 U.S. 507, 515, 100 S.Ct. 1287, 1293, 63 L.Ed.2d 574 (1980); Elrod v. Burns, 427 U.S. 347, 359, 96 S.Ct. 2673, 2683, 49 L.Ed.2d 547 (1976) (plurality opinion). The First Amendment, however, does not require absolute political neutrality by a public employer in making employment decisions. See Rutan, 497 U.S. at 74, 110 S.Ct. at 2736; Branti, 445 U.S. at 518, 520 n.14, 100 S.Ct. at 1294—95 n.14; Elrod, 427 U.S. at 365—368, 96 S.Ct. at 2685—2687. In an effort to minimize the adverse impact unqualified speech rights would exact on the efficacy and efficiency of government operations, the Supreme Court has enunciated certain exceptions to these general First Amendment principles. See Branti, 445 U.S. at 517, 100 S.Ct. at 1293-94; Elrod, 427 U.S. at 373, 96 S.Ct. at 2680—81.

7

Although the exceptions formerly were couched in terms of the "confidential" or "policy making" nature of the position at issue, the Supreme Court in Branti found this distinction both over inclusive and under inclusive and opted for a more functional analysis. See Branti, 445 U.S. at 518, 100 S.Ct. at 1295 ("[T]he ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved."). See Elrod, 427 U.S. at 375, 96 S.Ct. at 2690. Under Branti, an employee loses her constitutional protections and therefore may be terminated lawfully based on political beliefs or affiliations only where first, there is room for principled disagreement in the decisions reached by the employee and her supervisors, and second, the employee has meaningful input, either directly or indirectly, into the decision-making processes. See Kiddy-Brown v. Blagojevich, 408 F.3d 346, 355 (7th Cir. 2005); Tomczak v. City of Chicago, 765 F.2d 633, 641 (7th Cir. 1985); Nekolny v. Painter, 653 F.2d 1164, 1170 (7th Cir. 1981), cert. denied, 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982)), cert. denied, 474 U.S. 946, 106 S.Ct. 313, 88 L.Ed.2d 289 (1985). Stated differently, this prohibition on terminating public employees does not apply

when the "nature of [the] job makes political loyalty a valid qualification" for the effective performance of the position. Riley v. Blagojevich, 425 F.3d 357, 359 (7th Cir. 2005).

Likewise, The ADEA expressly excludes from coverage, "appointee[s] on the policymaking level," "adviser[s] with respect to the exercise of the constitutional or legal powers," and "person[s] elected to public office [or] chosen by such officer to be on such officer's personal staff."  42 U.S.C. §2000e(f). Although some have attacked this symmetry as outdated and misguided, this Circuit routinely has rejected such arguments, reasoning instead that there exists little, if any, distinction between an aggrieved individual's classification of "policymaker" under the ADEA as opposed to the First Amendment.  See Opp v. Office of State's Attorney of Cook County, 630 F.3d 616, 620 (7th Cir. 2010) ("[T]he test for determining if someone is an 'employee' . . . is essentially indistinguishable from that applied in the political firing context under the Elrod/Branti doctrine.") (quoting Americanos v. Carter, 74 F.3d 138, 144 (7th Cir. 1996)).  See also Heck v. City of Freeport, 985 F.2d 305, 310 (7th Cir. 1993) ("The reasons for exempting the office from the patronage ban apply with equal force to the requirements of the ADEA.").  But see Butler v. New York State Dep't of Law, 211 F.3d 739, 746—47 (2nd Cir. 2000) (applying the Elrod/Branti doc-

trine as to First Amendment claims, and drawing on Title VII
statutory language and Congressional intent for a Title VII
analysis).  The analysis required to determine whether the posi-
tion was confidential or policy making under both claims is
"essentially indistinguishable."  See Opp, 630 F.3d at 620.

In determining whether the position is "policy making" or
"confidential", the court should focus on the inherent character-
istics of the position itself, as described by an official job
description.  Allen v. Martin, 460 F.3d 939, 944 (7th Cir. 2006).
The court must not generalize regarding certain occupational
titles such as "secretary" or "bailiff" but should apply the
Branti framework to each individual office, as distinguished from
a particular office-holder.  See Riley, 425 F.3d at 360 ("[T]he
same title can denote quite different levels of responsibility —
a deputy sheriff could be a policeman in one sheriff's department
and the second in command in another . . . ."); Flenner v.
Sheahan, 107 F.3d 459, 463 (7th Cir. 1997) ("As early as 1975,
this court rejected the notion that labels or job titles are
relevant to the inquiry into whether patronage dismissal is per-
missible."); Meeks v. Grimes, 779 F.2d 417, 420 n.2 (7th Cir.
1985) ("[O]ur focus is on the 'inherent powers' of the office,
not what any individual officeholder actually does.").  See also
Gordon v. County of Rockland, 110 F.3d 886, 888 (2nd Cir. 1997)

(explaining that the court must look at the inherent duties of
the position, not the actions taken by the individual plaintiff);
Ness v. Marshall, 660 F.2d 517, 522 (3rd Cir. 1981) (same).

In assessing the propriety of a political employment crite-
rion, courts first must look to the official duties of a given
position.  See Powers v. Richards, 549 F.3d 505, 510 (7th Cir.
2008) ("[A]s long as an official description is reliable, we
focus on the inherent duties of the position as listed in the
description.  [Because plaintiff] does not dispute that the
official job description accurately explains the responsibilities
of [his position,] our analysis of his job duties begins and ends
there."); Riley, 425 F.3d at 364 ("[T]he job description, if
reliable, is the correct basis for the court's determining
whether political affiliation is a legitimate requirement of the
job.").  Only when a plaintiff has demonstrated that such written
duties are systemically unreliable, subjectively manipulated, or
otherwise untrustworthy or unauthoritative, should the tribunal
consider the intricacies of the position and the duties actually
performed by the individual at issue.  See Allen, 460 F.3d at 944
("Before we may address the constitutionality of the [political
firing], we must first determine what evidence to consider.
. . .  We only look past the [official] job description where the
plaintiff demonstrates some systematic unreliability."); Riley,

425 F.3d at 360 ("[I]f no basis is presented for thinking the official job descriptions systemically unreliable in a sense to be explained, the elected officials can rely on them, even if a plaintiff is prepared to testify (self-servingly) that the job description doesn't actually describe what he does . . .").  See also Baker v. Hadley, 167 F.3d 1014, 1018—19 (6th Cir. 1999) ("When the inherent duties are not readily ascertainable, courts may look to the duties as the plaintiff actually performed them as evidence of what the position inherently entails.").  This is by no means an easy feat, especially when, as here, a particular position has little or no written job description.  See Heck, 985 F.2d at 309 ("[D]etermining the 'powers inherent in a given office' à la Tomczak, apart from any concept of the tasks the office-holder actually performs, requires a feat of abstraction difficult under ordinary circumstances, but especially so when the legislation defining the office is brief and unspecific.").  In such circumstances, courts in this circuit often look to when the job description was promulgated, when and how it was last updated, and whether the written duties have been finessed, engineered, or deviated from so as to provide officials with expanded political power.  See Riley, 425 F.3d at 360—61 ("[I]n-quiry must focus on how the description was created; how it is updated and thus kept realistic rather than being allowed to

drift far from the actual duties of the position; in short, on how reliable, how authoritative, the description is."). See also Allen, 460 F.3d at 944—45; Powers, 549 F.3d at 509—511.

Once a court has defined the parameters of the position, the remaining question, whether the position was ministerial or policy making, is no less difficult. See Riley, 425 F.3d at 359—60 (providing a table of Seventh Circuit cases assessing the permissibility of political affiliation as a job criterion, and noting the "uncertainty in the case law demonstrated in our table"). See also Rutan, 497 U.S. at 92, 110 S.Ct. at 2746, (Scalia, J., dissenting) ("It is hard to say precisely (or even generally) what ['appropriate requirement'] means . . ."). This is due to the incentive for a plaintiff to downplay the impor-tance of her position, while a defendant invariably will attempt to elevate its significance. See Tomczak, 765 F.2d at 638. Nonetheless, courts attempting to place a position upon the spectrum between policy maker and cleric have found the following indicia helpful: relative pay, technical competence, authority over others, authority to speak on behalf of policymakers, public perception, influence on pro- grams and their implementation, contact with elected officials, and responsiveness to partisan politics and political leaders. See Ecker v. Cohalan, 542 F.Supp. 896, 901 (E.D.N.Y. 1982) (first enunciating the Second

Circuit's "Vezzetti factors" for determining the propriety of a politically charged employment requirement). See also Vezzetti v. Pellegrini, 22 F.3d 483, 486 (2nd Cir. 1994) (first adopting the factors as the law of the Second Circuit).

The dispositive inquiry in the present litigation is whether the powers inherent in the Deputy #1 position of the Clerk-Treasurer's office of Lake Station are such that party affiliation is an appropriate requirement for effective job performance. In other words, is there room for principled disagreement between the Clerk-Treasurer and Deputy #1 as to decisions regarding policy goals or implementation when Deputy #1 is vested with meaningful input, either directly or indirectly, into such decisions. See Branti, 445 U.S. at 518, 100 S.Ct. at 1295; Meeks, 779 F.2d at 421 n.2; Tomczak, 765 F.2d at 641. Lake Station bears the burden as to this showing. See Elrod, 427 U.S. at 368, 96 S.Ct. at 2687 ("[A]s we have noted, it is the government's burden to demonstrate an overriding interest in order to validate an encroachment on protected interests . . . ."); Kiddy-Brown, 408 F.3d at 354 ("Ultimately, a defendant bears the burden of establishing that a plaintiff's position falls within the exception to the general prohibition on patronage dismissal."); Matlock v. Barnes, 932 F.2d 658, 663 (7th Cir. 1991) ("In political patronage cases, defendants bear the burden of establishing that

14

political affiliation is an appropriate qualification for the job from which plaintiff is ousted."). See also Rutan, 497 U.S. at 71 n.5, 110 S.Ct. at 2735 n.5 ("[A] State demonstrates a compelling interest in infringing First Amendment rights only when it can show that party affiliation is an appropriate requirement for the effective performance of the public office involved.") (internal quotation and citation omitted).

For purposes of summary judgment, Lake Station has failed to meet its burden and has not established that the powers inherent in the Deputy #1 position of the Clerk-Treasurer's Office rise to the level of "policymaking" such that political affiliation was a permissible employment requirement. That is, Lake Station has not shown that Vajner, as Deputy #1 of the Clerk-Treasurer's Office, was able to offer meaningful input, either directly or indirectly, into the decisionmaking processes of her department or of Lake Station as a whole. Vajner, for instance, never had the authority to appoint deputy clerks, hire additional employ-ees, or supervise employees. She could endorse city checks, but that in and of itself involves little, if any, policy making discretion or authority. Also, assuming that Deputy #1 serves as the second in command position of the Clerk-Treasurer's Office, Vajner still would have had supervisory authority over only three individuals. Many of Vajner's job functions appear wholly

ministerial, and even as to those involving coordination and interaction with other political individuals, her ability to influence policy appears minimal at best.  Also implying constrained authority is that on at least one occasion, Vajner was informed that she could not close the office to mourn the death of a former Clerk-Treasurer.  (See Vajner Aff. ¶ 7)

Lake Station has failed to offer undisputed evidence where Vajner, as Deputy #1, and the Clerk-Treasurer could have had principled disagreements, and in such areas, where Vajner could have offered meaningful input as to policy goals or implementation.  Although Lake Station suggests that Vajner could "exercise control over the City's finances," it has failed to establish as much.  (Deft. Reply Mem. at p. 3)  Vajner's position does not facially entail the same sort of discretionary judgment, management oversight, or meaningful participation inherent in the positions this circuit previously has encountered and analyzed, and Lake Station has not carried its burden demonstrating otherwise.

Lake Station cites to Tomczak for the proposition that the "second in command position is invariably an exempt or unprotected position" in the context of political firings.  (See Deft. Mem. Sup. Sum. Judg. at p. 6)  This misreads Tomczak on multiple fronts.  Most notably, however, such a reading conflicts with the

Supreme Court's express directive that courts should assess the inherent powers of a given position without relying on superficial labels or categories. The court in Tomczak did not base its decision solely on the fact the First Deputy Commissioner of the Bureau of Water Distribution was "second in command" in his office. Rather, the court undertook an extensive analysis of the specific duties which the position at issue performed. The court outlined and considered the inherent powers of the position including the relative pay within the department, the number of employees supervised, the ability to make recommendations and thereby affect policy decisions, the overall budget of the department, and the authority to amend new construction plans. See Tomczak, 765 F.2d at 641–42. Thus, the Tomczak court specifically conducted a detailed investigation of the powers inherent in the position and did not summarily conclude that "second in command positions" necessarily entail policymaking or confidential duties.

Lake Station further argues that Vajner's position was inherently policymaking because she served as a de facto Clerk-Treasurer when vacancies arose. Here, although Vajner admittedly assumed the duties of the Clerk-Treasurer position during several periods of absence, Elrod and Branti counsel against a particularized inquiry as to Vajner herself but require this court to

assess the position of Deputy #1 more generally and abstractly.
The powers inherent in the Deputy #1 position, not the powers
specifically performed by Vajner as Deputy #1, are at issue in
this litigation. The Deputy #1 position arguably appears to be
the "second-in-command" position in the Clerk-Treasurer's Office,
and it might reasonably be inferred that the Deputy #1 would
assume the Clerk-Treasurer duties in the event of an absence.
(See Aff. of Brenda Samuels ¶¶ 4—5; Vajner Dep. at p. 102; Pltf.
Dep. Exh. 2) But that is not entirely clear. No written job
duties require that the Deputy #1 act as interim Clerk-Treasurer,
and while tradition perhaps reflects that a Deputy #1 is expected
to assume many necessary duties, insofar as the record reflects,
that was not inherent within the position. In fact, it appears
that the unwritten, informal policies here were that the office
staff collectively assumed the Clerk-Treasurer responsibilities
when necessary, though Vajner may have undertaken more than
others. If Lake Station could demonstrate, in fact, that the
inherent duties of the Deputy #1 position required that office-
holder to fill the position of Clerk-Treasurer when necessary,
the analysis might differ. Lake Station simply has not done so
at this stage of the proceedings.

Adding to the difficulty in ascertaining the powers inherent
within the Deputy #1 position is the lack of written job descrip-

tions for the deputy clerk positions in the Clerk-Treasurer department and the ambiguity as to the respective duties of each. Hardly a model of clarity, the deputy clerks in Lake Station apparently learn of their responsibilities and duties from their predecessors and by example without the assistance of a written manual or statutory grant of authority. Due to this uncertainty, Vajner performed the duties informally reserved to all four deputy clerk positions throughout her tenure with Lake Station. Moreover, the record indicates that much of the department's work was divided amongst the office staff based on the particular individuals in the office at that time, as opposed to their respective "rank" within the office. The precise duties inherent within the Deputy #1 position, as with the other deputy positions, are unclear to say the least.

Moreover, in asserting that Vajner's position as Deputy #1 is policymaking by virtue of interim stints as Clerk-Treasurer, Lake Station implies that during other times — times Vajner was discharging her duties as Deputy #1 — she was not acting in a policymaking capacity. In its brief, Lake Station extensively cites and recounts the statutorily prescribed duties of the actual Clerk-Treasurer, but Vajner never was the actual Clerk-Treasurer. (See Deft. Mem. Sup. Sum. Judg. at pp. 7—8) Vajner had acted as Clerk-Treasurer in the past, and had even discharged

duties traditionally reserved to that officeholder, but that is
not the inquiry this court must undertake.  Vajner was fired from
her position as Deputy #1.  The mayor's step-daughter replaced
her at the Deputy #1 position.  That is the position at issue
here.  If it were solely these interim periods as Clerk-Treasurer
which transformed Vajner's role from ministerial to policymaking,
it is the inherent powers of the Clerk-Treasurer position, not
the Deputy #1 position, that properly allows for patronage
dismissal.

Lake Station's failure to establish that Vajner's position
was inherently policymaking does not end the analysis.  See
Meeks, 779 F.2d at 421 ("This does not end our analysis because,
as was alluded to in [Soderbeck and Stegmaier], there are circum-
stances in which the animosity engendered by a political struggle
makes it impossible for two people to work together in an inti-
mate environment.").  This circuit has reasoned, pre-Branti and
Rutan, that even where principled disagreement and meaningful
input into decision making are lacking, political affiliation
will be a permissible employment criterion where individuals work
in "intimate settings" or in situations with heightened concerns
regarding access to sensitive or confidential information. See
Meeks, 779 F.2d at 423; Soderbeck v. Burnett County, Wisc., 752
F.2d 285, 288 (7th Cir. 1985)  See also Ill. State Employees

Union, Council 34 v. Lewis, 473 F.2d 561, 574 (7th Cir. 1972)

("Plaintiffs properly do not challenge the public executive's

right to use political philosophy or affiliation as one criterion

in the selection of policy-making officials.  Moreover, consider-

ations of personal loyalty, or other factors besides determina-

tion of policy, may justify the employment of political associ-

ates in certain positions."), cert. denied, 410 U.S. 928, 943, 93

S.Ct. 1364, 1370, 35 L.Ed.2d 590 (1973)).  Cf. Stegmaier v.

Trammell, 597 F.2d 1027, 1040 (5th Cir. 1979) (holding that the

plaintiff fell within the "confidential employee exception even

though the position of Deputy Circuit Clerk does not stand in a

confidential relationship to a policymaker or a policymaking

process").

The "confidential" and "intimate environment" exceptions,

though articulated prior to Branti, derive from the same ratio-

nale: it is not the policymaking nature of a position that insu-

lates it from First Amendment scrutiny; rather, it is whether

political affiliation reasonably can be seen as having a detri-

mental effect on the performance of a particular position or

individual.  See Soderbeck, 752 F.2d at 288 (noting that these

exceptions are subsumed within the majority's broad formulation

in Branti).  Viewed as such, a politically motivated employment

qualification is, at times, equally as reasonable as applied to

an individual who, although serving in a purely ministerial capa-
city, is nonetheless charged with enforcing, implementing, or
assisting the policies of her superiors.  See Meeks, 779 F.2d at
420 ("[P]olitical antipathy can serve as a decent proxy for a
lack of trust and loyalty where the employee's responsibilities
include a duty to shield the decisionmaking process from the
outside world."); Soderbeck, 752 F.2d at 288 ("You cannot run a
government with officials who are forced to keep political
enemies as their confidential secretary . . .).  But see Rutan,
497 U.S. at 74—75, 110 S.Ct. at 2737 (denouncing patronage
dismissals and finding the discharge of employees after poor job
performance is the preferred alternative to political employment
criteria).

The difficulty with the "confidentiality" and "intimate
environment" exceptions in the context of political patronage
cases, and the resulting hesitation on the part of courts to
extend the notion, is that it effectively licenses discrimination
if an office is small enough.  See Meeks, 779 F.2d at 421 n.5
("If she could be fired as a confidential employee, so could
anyone else employed in the office . . . .") (quoting Soderback,
752 F.2d at 288).  Courts in such situations have stressed the
limited nature of their holdings, but nonetheless recognized the
importance of preserving efficient government functions.  See

Meeks, 779 F.2d at 423 ("We must stress the limited nature of the scope of this opinion. [O]nly those employees who work in direct and constant contact with a political official-employer would be exempted from the First Amendment's protection against patronage dismissals.").  See also Rutan, 497 U.S. at 74, 110 S.Ct. at 2736 ("Unless these patronage practices are narrowly tailored to further vital government interests, we must conclude that they impermissibly encroach on First Amendment freedoms."); Elrod, 427 U.S. at 365, 96 S.Ct. at 2685 (plurality opinion) ("[I]t is doubtful that the mere difference of political persuasion motivates poor performance; nor do we think it legitimately may be used as a basis for imputing such behavior.").

Here, by keeping a small office and office staff in the Clerk-Treasurer's Office, Lake Station potentially is able to defend an employment criterion that might otherwise be impermissible by arguing that the environment in which it operates mandates political affiliation be considered in reaching employment decisions.  Cf. Meeks, 779 F.2d at 423 n.6 (noting that small office settings often "constitute cells within an organization where relationships must be based on loyalty and rapport because of the constant face to face contact resulting from the more intimate surroundings").  Lake Station argues that the nature of Vajner's position, by virtue of her serving an elected

official in an intimate setting and on a small staff, exempts her position from the First Amendment ban on political patronage firings.  Lake Station further contends that extending First Amendment protection to Vajner's position would undermine the ability of new administrations in the Clerk-Treasurer's Office from implementing and achieving the policy goals for which they were elected.  Vajner counters by minimizing the closeness between the Deputy #1 position and Clerk-Treasurer and emphasizing that she was sworn to "serve the public," and therefore political loyalty was not a permissible criterion for employment.  (Pltf. Mem. Resp. Deft. Mot. Sum. Judg. at p. 12)

Spatially, the physical office setting of the Clerk-Treasurer department is modest.  The office itself consists of only three rooms.  Individuals within the office need not use a telephone to communicate with one another because a sufficiently loud voice travels throughout the area.  It is especially true in such a small office setting with such a small office staff, that an elected individual must be able to rely completely on his deputy employees.  See Heidman v. Wirsing, 7 F.3d 659, 664 (7th Cir. 1993) ("If patronage-based employment decisions turn on the reliability of the deputy, performance is a more relevant criterion.  In this regard, the need for mutual trust and confidence, particularly in smaller departments, supports the conclusion that

political conclusions do matter."). Courts in this circuit have refused to compel political enemies to coordinate the operations of a governmental department when forced to work in intimate settings. See Meeks, 779 F.2d at 423; Soderbeck, 752 F.2d at 285; Stegmaier, 597 F.2d at 1040. However, the cases permitting ministerial employees to be discharged for purely political reasons have based their rulings on not only the intimacy of the office space, but also on the employee's potential exposure to confidential information, the need to be able to trust and confide in the employee, and whether the employee would be in direct and constant contact with the political official. Meeks, 779 F.2d at 423 (This exception "applies to a select number of government employees: only those employees who work in direct and constant contact with a political official-employer would be exempted from the First Amendment's protection against patronage dismissals").

Lake Station falls short of establishing by undisputed evidence that Vajner's position gave her exposure to confidential information or that the Clerk-Treasurer needed to be able to confide in Vajner. Although it is true that in a small office the official likely needs to trust her entire staff, Lake Station has not proven that such a relationship was necessary in this environment. To begin, Lake Station has not submitted any proof

that Vajner would work closely with the Clerk-Treasurer on any facet of their positions. The court does not know whether the Clerk-Treasurer conferred with the deputies over the budget or relied on them to carry out discretionary policies. In fact, the former Clerk-Treasurer, Smelley, was absent from the office for months, suggesting that Vajner's job was greatly independent from the duties of the Clerk-Treasurer.

Lake Station submits that Vajner became familiar with the budget process. However, it has not shown that, as part of her inherent job requirements in the Deputy #1 position, the Clerk-Treasurer ever exposed Vajner to confidential information related to the budget or that Vajner was required to become involved in the process. Although Vajner previously was privy to budget meetings, it is apparent that she did this when acting as Clerk-Treasurer. Regardless of the process of drafting a budget, the Clerk-Treasurer was required to submit the budget for review at a public meeting. Therefore, nothing in the budget was confidential.

Although the intimate setting of the small Clerk-Treasurer's Office suggests that the Clerk-Treasurer must be able to rely on the Deputy #1, the court cannot so conclude based simply on the size of the office without proof that Vajner's position required her either to work closely with the Clerk-Treasurer or exposed

her to confidential information.  There is nothing inherent about Vajner's position that would lead the court to conclude that undivided political loyalty would increase the efficiency of the Clerk-Treasurer's Office.

Without greater clarity on precisely what were the Deputy #1's job duties, the court cannot determine whether Vajner was a policy maker, worked in close contact with the Clerk-Treasurer, or routinely was exposed to confidential information.  There remains a genuine issue of material fact concerning whether Vajner's position was purely ministerial and did not require loyalty, or whether her job duties extended beyond bookkeeping to permit a political firing either because she was a "policy maker", confidential employee, or because she was required to work closely with the Clerk-Treasurer.  For these reasons, Lake Station's motion for summary judgment on Vajner's First Amendment and ADEA claims is DENIED.

In addition to her First Amendment and ADEA claims, Vajner also asserts a claim against Lake Station under 42 U.S.C. §1985(3), alleging the Mayor of Lake Station and Brenda Samuels conspired to deprive her of her constitutional rights.  To prevail in an action for conspiracy under this section, Vajner must prove four elements:  (1) that two or more defendants conspired, (2) for the purpose of depriving the plaintiff of a

constitutional right, (3) one or more of the conspirators acted in furtherance of the conspiracy, and (4) such act injured a person or his property or deprived him of exercising any right or privilege of a citizen of the United States. Munson v. Friske, 754 F.2d 683, 694 (7th Cir. 1985). The only argument Lake Station advances in favor of summary judgment on this claim is that it did not deprive Vajner of her rights or property because it acted lawfully in terminating her. Because the court found that a question of material fact remains concerning the lawfulness of her termination, summary judgment is DENIED on this account.

Finally, 42 U.S.C. §1988 makes available attorneys fees for a "prevailing party" in civil rights actions. Fees are available to both prevailing defendants and prevailing plaintiffs, however, the analysis as to whether fees should be allowed differs to reflect policy considerations. See Unity Ventures v. County of Lake, 894 F.2d 250, 258 (7th Cir. 1990). To collect fees, a prevailing defendant must demonstrate that the plaintiff brought her action in subjective bad faith, or that "the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith." Unity Ventures, 894 F.2d at 253 (quoting Christiansburg Garment Co. v. Equal Employment Opportunity Comm'n, 434 U.S. 412, 421, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978)); Munson, 754 F.2d at 698; Hermes v. Hein, 742

F.2d 350, 356 n.7 (7th Cir. 1984).  The award of attorney's fees is within the sound discretion of the trial court because it is in the best position to make "the partially subjective findings necessary for an award of fees and to perform the balancing of equities that is an integral part of the proceeding for an award of fees."  Munson, 754 F.2d at 696 (citing Harrington v. DeVito and Dunne, 656 F.2d 264, 266 (7th Cir. 1981), cert. denied, 455 U.S. 993, 102 S.Ct. 1621, 71 L.Ed.2d 854 (1982)).  This circuit has devised a series of factors for guiding this discretionary judgment: "whether the issue is one of first impression requiring judicial resolution; whether the controversy is sufficiently based upon a real threat of injury to the plaintiff; whether the trial court has made a finding that the suit was frivolous under the Christiansburg guidelines; and whether the record would support such a finding." Munson, 754 F.2d at 696—97 (citing Reichenberger v. Pritchard, 660 F.2d 280, 288 (7th Cir. 1981)).

Here, as evidence by the court's denial of summary judgment and the difficulty encountered in parsing out merits of the claim before the court, it is clear Vajner did not bring her claim in subjective bad faith, on frivolous facts, or without foundation. This court, on the record before it, cannot conclude that Vajner's claims were brought in such a manner that would entitle Lake Station to attorney's fees under Section §1988.

_____

Based on the foregoing reasons, the Motion for Summary

Judgment [DE 21] filed by the defendant, City of Lake Station,

Indiana, on August 31, 2010, is DENIED.

ENTERED this 3rd day of May, 2011

                              s/ ANDREW P. RODOVICH
                                 United States Magistrate Judge